UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------

JOHN BARRETT, BILL BEAURY, JOSEPH
BELCASTRO, PETER BROWN, MICHAEL
GEIDEL, JOHN HANSEN, JOSEPH NACARLO,
RICHARD NARCISO, PATRICK O'CONNOR, and
JOSEPH TALLINI, on behalf of themselves and others
similarly situated,

Plaintiffs,

- against -

MICHAEL STAPLETON ASSOCIATES, LTD., doing
business as MSA SECURITY, and MICHAEL
O'NEILL,

Defendants.

------------------------------------------------------------

Complaint and
Demand for Jury Trial

Docket No:

Plaintiffs, as and for their complaint against defendants, allege as follows:

## Introduction

1.       This is an action to recover damages and for injunctive relief. This action is brought pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq*., New York Labor Law ("NYLL") Article 6, and 12 New York Codes, Rules and Regulations ("NYCRR") subpart 142-2.2 as to unpaid overtime wages owed to plaintiffs and all similarly situated persons who are presently or were formerly employed by defendant Michael Stapleton Associates, Ltd. doing business as MSA Security ("MSA") and defendant Michael O'Neill ("O'Neill") and/or any other entities affiliated with or controlled by defendants.

## The Parties, Jurisdiction and Venue

2.       Defendant MSA is a foreign corporation registered in the State of New York. Its principal place of business is 9 Murray Street, New York, NY 10007.

3.      Defendant O'Neill is the Chief Executive Officer of MSA. Upon information and belief, he exercises substantial control over the operations of MSA, authorizes and implements the procedures and policies of MSA and, through the officers, directors and supervisors under his direct control and supervision, has final authority and control over all of the employees of MSA. Upon information and belief, his business address is 9 Murray Street, New York, NY 10007. Upon information and belief, O'Neill is a citizen and resident of the State of New York.

4.      Upon information and belief, MSA is a broad-based security firm with over 850 employees. MSA specializes in canine services, i.e., bomb-sniffing dogs, and claims to be one of the largest of its kind in the nation.

5.      Upon information and belief, MSA has annual revenues substantially in excess of Eleven Million Dollars ($11,000,000.00) from government contracts alone. MSA is an enterprise actively engaged in interstate and international commerce.

6.      MSA is an "employer" under NYLL § 651(6).

7.      MSA is an "employer" under 29 U.S.C. § 203(d).

8.       O'Neill is an "employer" under NYLL § 651(6).

9.       O'Neill is an "employer" under 29 U.S.C. § 203(d).

10.     Plaintiffs and other members of the proposed class were or are "employees" of MSA under NYLL § 651(5).

11.     Plaintiffs and other members of the proposed collective were or are "employees" under 29 U.S.C. § 203(e).

12.     Plaintiffs and proposed class and collective members are current and former employees of MSA, all of whom are or were employed as handlers of bomb-sniffing dogs, and most of whom reside in the State of New York. Plaintiffs and proposed class members include

retirees of the New York City Police Department, the NYC Corrections Department, former NYS Court Officers, and former United States military personnel.

13.   According to MSA, "MSA's full-time team of EDC handlers carries both military and law enforcement backgrounds. Before they begin working with MSA dogs, they undergo extensive training in Explosive Detection, Counter Surveillance and Behavior Pattern Recognition. They receive continuing education and training to successfully address the ever-evolving threat of IEDs."

14.   Plaintiff JOHN BARRETT ("Barrett") is a citizen of the State of New Jersey residing at 62 Myrtle Road, Manahawkin, NJ 08050. Barrett is a current employee of MSA, serving as a bomb-sniffing dog handler from 2011 to present day. Prior to being employed by MSA, Barrett was a 20-year veteran of the New York City Police Department and retired as a Sergeant on the Homicide Squad. Mr. Barrett was a *9-11* Responder.

15.   Plaintiff BILL BEAURY ("Beaury") is a citizen of the State of New York residing at 16 Connelly Drive, Lake Grove, NY 11755. Beaury is a former employee of MSA, having served as a bomb-sniffing dog handler between January 2002 to March 2016. Prior to being employed by MSA, Beaury was a 21-year veteran of the New York City Police Department. During his time as a police officer, Beaury was as a union delegate and a *9-11* Responder.

16.   Plaintiff JOSEPH BELCASTRO ("Belcastro") is a citizen of the State of New York residing at 80 Rugby Avenue, Staten Island, NY 10301. Belcastro is a current employee of MSA, serving as a bomb-sniffing dog handler from 2008 to present day. Prior to being employed by MSA, Belcastro was a 20-year veteran of the New York City Police Department and retired as a Detective. Belcastro was a *9-11* Responder.

17.     Plaintiff PETER BROWN ("Brown") is a citizen of the State of New York residing at 45 Revere Circle, Washingtonville, NY 10992. Brown is a former employee of MSA, having served as a bomb-sniffing dog handler between October 2005 to January 2017. Prior to being employed by MSA, Brown was a 20-year veteran of the New York City Police Department, retired as a Sergeant, and was a *9-11* Responder.

18.     Plaintiff MICHAEL GEIDEL ("Geidel") is a citizen of the State of New York residing at 36 Daffodil Court, Staten Island, NY 10312. Geidel is a current employee of MSA, serving as a bomb-sniffing dog handler from 2013 to present day. Prior to being employed by MSA, Geidel was an E-5 Sergeant for the United States Air Force.

19.     Plaintiff JOHN HANSEN ("Hansen") is a citizen of the State of New York residing at 2050 East 74th Street, Brooklyn, NY 11234. Mr. Hansen is a current employee of MSA, has been an employee of MSA since 2006, and has served as a bomb-sniffing dog handler from 2014 to present day. Between February 2016 and September 2016, Hansen was employed by MSA as a supervisor of the company's bomb-sniffing dog handlers. Prior to being employed by MSA, Hansen was a 20-year veteran of the New York City Police Department and retired as a Detective. Hansen was a *9-11* Responder.

20.     Plaintiff JOSEPH NACARLO ("Narcolo") is a citizen of the State of New York residing at 425 18th Street, West Babylon, NY 11704. Narcolo is a current employee of MSA. Narcolo served as a bomb-sniffing dog handler for MSA from 2001 to 2014 and from March 2016 to present, and as a Field Supervisor from September 2014 through March 2016. Prior to being employed by MSA, Narcolo was a 22-year veteran of the New York City Police Department and retired as a Sergeant. Narcolo was a *9-11* Responder.

21.     Plaintiff RICHARD NARCISO ("Narciso") is a citizen of the State of New York residing at 45 Amsterdam Place, Staten Island, NY 10314. Narciso is a former employee of MSA, having served as a bomb-sniffing dog handler from 2004 to 2016. Prior to being employed by MSA, Narciso was a 20-year veteran of the New York City Police Department and retired as a Detective. Narciso was a *9-11* Responder.

22.     Plaintiff PATRICK O'CONNOR ("O'Connor") is a citizen of the State of New York residing at 96 Third Avenue, East Rockaway, NY 11518. O'Connor is a former employee of MSA, having served as a bomb-sniffing dog handler from 2003 to 2015. Prior to being employed by MSA, O'Connor was a 20-year veteran of the New York City Police Department and retired as a Detective on the Bomb Squad. O'Connor was a *9-11* Responder.

23.     Plaintiff JOSEPH TALLINI ("Tallini") is a citizen of the State of New York residing at 25 Chestnut Street, Lake Ronkonkoma, NY 11779. Tallini is a current employee of MSA, serving as a bomb-sniffing dog handler from 2012 to present day. Prior to being employed by MSA, Tallini was a 20-year veteran of the New York City Police Department.

24.     Subject matter jurisdiction exists with respect to this action pursuant to 29 U.S.C. § 216(b) and 28 U.S.C.§ 1331. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over the claims brought under the provisions of the NYLL and the NYCRR.

25.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) in that a substantial part of the events giving rise to the claims herein occurred within this district, and pursuant to 18 U.S.C. § 1965 in that defendants' principal places of business are within this district and defendants transact their affairs within this district.

26.     Personal jurisdiction exists pursuant to CPLR §§ 301 and 302 because defendants' principal places of business are within New York, and the claims hereunder arise out of defendants' transaction of business in New York

## Collective Action Allegations

27.     This action is properly maintainable as a collective action pursuant to 29 U.S.C. § 2l6(b).

28.     This action is brought on behalf of the plaintiffs and a collective consisting of similarly situated employees who worked for defendants as bomb-sniffing dog-handlers.

29.     Plaintiffs and potential plaintiffs who elect to opt-in as part of the collective action are all victims of the defendants' common policy and/or plan to violate the FLSA by (1) failing to pay all earned wages; and (2) failing to provide overtime wages, at the rate of one and one-half times the regular rate of pay, for all time worked in excess of 40 hours in any given week pursuant to 29 U.S.C. § 207.

30.     The size of the proposed collective is believed to be in excess of 250 bomb-sniffing dog handlers. The names of all potential members of the proposed collective are not known or knowable without defendants' records or discovery.

31.     The questions of law and fact common to the proposed collective predominate over any questions affecting only individual members. These questions of law and fact include, but are not limited to: (1) whether defendants failed to pay plaintiffs and members of the proposed collective all earned wages; (2) and whether the defendants required plaintiff and members of the proposed collective to perform work on its behalf and for its benefit for which they were not compensated; and (3) whether the defendants failed to pay overtime wages, at the rate of one and one half times the regular rate of pay, for all hours worked in excess of 40 hours in any given week in violation of the FLSA.

32.     The claims of the plaintiffs are typical of the claims of the proposed collective. The plaintiffs and proposed collective members were all subject to defendants' policies and willful practices of failing to pay employees all earned overtime wages. Plaintiffs and proposed collective members have thus sustained similar injuries as a result of the defendants' actions.

33.     Upon information and belief, defendants uniformly apply the same employment policies, practices, and procedures to all bomb-sniffing dog handlers who work at defendants' locations.

34.     Plaintiffs and their counsel will fairly and adequately protect the interests of the proposed collective. Plaintiffs have retained counsel experienced in complex wage and hour collective and class action litigation.

35.     A collective action is superior to other available methods for the fair and efficient adjudication of this controversy. The individual plaintiffs and proposed collective members lack the financial resources to adequately prosecute separate lawsuits against defendants.

**Class Action Allegations**

36.     This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

37.     This action is brought on behalf of the plaintiffs and a class consisting of similarly situated employees who worked for defendants as bomb-sniffing dog handlers.

38.     The proposed class is so numerous that joinder of all members is impracticable. The size of the proposed class is believed to be in excess of 250 bomb-sniffing dog handlers. In addition, the names of all potential members of the proposed class are not known or knowable without defendants' records or discovery.

39.     Defendants have acted and refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

40.     The questions of law and fact common to the proposed class predominate over any questions affecting only individual members. These questions of law and fact include, but are not limited to: (1) whether defendants failed to pay plaintiffs and members of the proposed class all earned wages; (2) and whether the defendants required plaintiff and members of the proposed class to perform work on its behalf and for its benefit for which they were not compensated; and (3) whether the defendants failed to pay overtime wages, at the rate of one and one half times the regular rate of pay, for all hours worked in excess of 40 hours in any given week in violation of New York state law.

41.     The claims of the plaintiffs are typical of the claims of the proposed class. The plaintiffs and proposed class members were all subject to defendants' policies and willful practices of failing to pay employees all earned overtime wages. plaintiffs and proposed class members have thus sustained similar injuries as a result of the defendants' actions.

42.     Upon information and belief, defendants uniformly apply the same employment policies, practices, and procedures to all bomb-sniffing dog handlers who work at defendants' locations.

43.     Plaintiffs and their counsel will fairly and adequately protect the interests of the proposed class. Plaintiffs have retained counsel experienced in complex wage and hour collective and class action litigation.

44.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The individual plaintiffs and proposed class members lack the

financial resources to adequately prosecute separate lawsuits against defendants. A class action will also prevent unduly duplicative litigation resulting from inconsistent judgments pertaining to the defendants' policies.

## Factual Background

45.     At all relevant times, the plaintiffs and proposed collective and class members were all hourly employees compensated at a regular rate of approximately $30 an hour from July 18, 2011 to the present ("the Class Period")

46.     At all relevant times, the plaintiffs and proposed collective and class members were at-will employees. Upon information and belief, at all relevant times, there were no written contracts between the parties hereto.

47.     At all relevant times, the plaintiffs and proposed collective and class members were each assigned a bomb-sniffing dog (usually a Labrador Retriever) which lived in their homes. These dogs live and work continuously with the plaintiffs and the proposed class members, but remain the property of MSA. At any time, the dogs may be removed from the possession of plaintiffs by these defendants for any reason or for no reason at all, at MSA's whim.

48.     MSA boasts that it has "a highly-successful Explosive Detection Canine (EDC) program" that is "rooted in an unmatched training philosophy and truly unique-to-the-industry focus on the development of single-purpose, single-handler teams that are trained exclusively in explosive odor detection." As part of this training, each bomb-sniffing dog requires constant training that entails many hours of work each day. This training requires that these animals only be fed after sniffing out the scent of explosives.

49.     MSA further boasts that "[d]ogs are trained daily utilizing either food or play rewards depending on their individual interest and always using real, uncontaminated explosives."

50.     As MSA describes it, "[u]nlike other providers, MSA bomb dogs are never kenneled or used by multiple handlers once put to work. They live at home with their handler and receive daily training. This improves their temperament and makes them far more effective at work."

51.     MSA also states that "[a]fter a hard day searching for explosives, it wouldn't be right to put an MSA canine in a cage. That's why MSA doesn't kennel our dogs. When their workday is over, they go home with their family." MSA also states "Another thing we don't do is break up their routine by assigning them multiple handlers. We stick to our 'One Dog, One Handler' policy. This ensures optimum performance, and keeps our dogs happy, healthy, and effective."

52.     Accordingly, defendants required plaintiffs to hand-feed their assigned animals all of their meals throughout their lives. All meals the bomb-sniffing dogs received were part of a required training regimen. In actual practice, trace amounts of explosives were hidden in vehicles or in rooms or in a backyard in a prescribed manner, and the dogs were required to find those explosives. The dogs were rewarded for finding the explosives with food, which is fed to them - one handful per session - by their plaintiff-handlers.

53.     The defendants require the plaintiffs, as a matter of policy and required procedure, to train/feed their dogs in this manner, seven days a week, 365 days a year. Each meal provided to the dog becomes a training session that is required to last from between one-half hour to one and a half hours (one to three hours each day of total feeding/training). Most of these

meal/training sessions must be provided during times when plaintiffs not on the clock, and therefore, contrary to New York and federal Law, is mandated uncompensated work time.

54.     Defendants required not only that the proposed collective and class members perform the bomb-sniffing dog training described above, but that the members document and report the hours spent doing so. Accordingly, the work described herein was performed with the knowledge of, and indeed at the direction of, the defendants. The proposed collective and class members typically have work schedules of eight, ten, or twelve-hour days, three to four days a week, excluding any additional overtime. Plaintiffs may train/feed the dogs at various times throughout the day, both when they are on-duty and when they are off-duty, but at least one meal is typically provided by the plaintiffs to the dogs, on any regular work day, when plaintiffs are off-duty and unpaid. Thus, for each day that the plaintiffs and proposed class and collective members worked, they were and remain unpaid for between 1/2 hour and one and a half hours of work per day.

55.     This daily training that the plaintiffs and members of the proposed collective and class must provide each day is provided without compensation to collective and class members, yet is integral to MSA's business. Indeed, MSA brags on its website that "[w]ith an uncompromised commitment to comprehensive best-in-class training of our canines and handlers, MSA delivers an unrivaled and nationally-certified Explosive Detection Canine (EDC) team that keeps millions of people safe across the globe."

56.     Each week, plaintiffs remain unpaid for an average minimum of one and a half hours (3 days worked per week, one half hour of feeding/training per day), to an average maximum of six hours per week (4 days worked per week, one and a half hours of

feeding/training per day), and regardless of whether such work would mandate payment of overtime under federal or state law.

57.     When plaintiffs had time off on their regular schedules (typically, 3-4 days a week), they were still required to train/feed their animals in the manner established by defendants' corporate procedure and policy. In other words, they were required to train/feed their assigned bomb-sniffing dogs between one and three hours a day when they had time off. At all relevant times, plaintiffs were not compensated for this work. Thus, each week, when they are not "working" at all, plaintiffs were unpaid for an average minimum of one and a half hours of work (3 days off per week; one half hour of feeding/training per day), to an average maximum of six hours per week (4 days off per week, one and a half hours of feeding/training per day), and regardless of whether such work would mandate payment of overtime under federal or state law.

58.     This required regimen did not change if any of the plaintiffs or proposed collective and class member worked part-time, such as one or two days a week. In such event, the amount of unpaid work conducted by the plaintiffs increased incrementally. Plaintiffs were still required to train/feed their dogs between one and three hours a day during the time plaintiffs were off-duty and unpaid, and regardless of whether such work might mandate payment of overtime under federal or state law.

59.     Defendants were required to pay plaintiffs for the time they spent of feeding, grooming, caring for and training of the dogs that they were assigned, but failed to do so. Defendants were also required to pay for tasks associated with the care of the dogs, such as taking the dogs to the veterinarian, but failed to do so.

60.     Defendants were required to pay plaintiffs for the travel time that was required for them to drive to from one work assignment to another, and time during the travel time associated

with grooming, caring for and training of the dogs, and transporting the dogs as required by defendants' business.

61.     Plaintiffs were indiscriminately paid at disparate rates for lunch hours and breaks. For some assignments, plaintiffs were not paid for lunch hours, and not paid for breaks, regardless of the length of the tour of duty.

62.     Approximately three times a year, plaintiffs were required to attend training and certification classes with their animals which each lasted approximately four hours. Such classes were typically conducted in Windsor, Connecticut. Plaintiffs travelled with their assigned bomb-sniffing dogs as much as five hours per day to and from said classes, and were not paid for this travel time. To the extent this time worked constituted overtime under state or federal law, plaintiffs were not paid for overtime.

63.     At various times during the Class Period, when plaintiffs attended these training classes, plaintiffs were paid a reduced "training rate" regardless of whether such reduced payments might otherwise mandate payment of overtime under federal or state law.

64.     At all relevant times, prior to any bomb-sniffing dog being "retired" at the age of about nine years, the veterinary care of such dogs was provided by veterinarians retained by the company at various locations throughout the Tri-State area or local veterinarians. Plaintiffs were not paid for the travel time associated with bringing their assigned bomb-sniffing dogs to these veterinarians. To the extent this additional time work constituted overtime under state or federal law, plaintiffs were not paid for overtime.

65.     Plaintiffs continually protested to MSA management with respect to the unpaid work time alleged herein. The defendants continuously ignored the protests of their plaintiff-employees.

66.     As described, the bomb-sniffing dogs were exclusively trained by their plaintiff-handlers, who were with their animals continuously, living with them and working with them. By virtue of this continuous physical proximity, and the unique activities shared between the plaintiffs and their animals, an unparalleled psychological and emotional bond was created between the plaintiffs and their assigned dogs.

67.     At all relevant times, defendants claimed and asserted ownership, dominance and control over the animals cared for and maintained by the plaintiffs. MSA could, and did remove dogs from the physical possession of plaintiffs for any reason or no reason.

68.     MSA, by its numerous officers and directors, intentionally, by design, in premeditated fashion, and in an active, on-going conspiracy with each other, alternatively employed its ability to take the dogs from the plaintiffs as both a means of retaliation, and as direct and indirect threats for purposes of squelching dissent, maintaining "order in the ranks," and discouraging objection to and reporting of the on-going, unlawful activities described herein.

69.     At various times, with actual malice, defendants intentionally exploited the bond between plaintiffs and their assigned dogs by retaliating against plaintiff-employees who they disfavored by taking their animals away from them. Where such proposed class and collective members were terminated, they were given no option to purchase or otherwise keep their previously assigned dogs.

70.     Plaintiffs had their regular posts or hours of duty changed if they protested the unlawful activities of the defendants described herein, if they have refused to accept unreasonable overtime assignments, if they were considered "problems," if they committed acts deemed "offensive" by Management.

71.     Throughout the Class Period, when the bomb-sniffing dogs reached the age of nine or ten, they were "retired" because defendants deemed them too old to perform their required functions. At such time the animals stayed, by design of the defendants, in the full-time care and custody of their plaintiff-handlers. Plaintiffs continued to feed, board, attend to, and provide for the medical care of their animals at their expense for the remainder of the animals' lives. Plaintiffs were then assigned younger dogs which, like their predecessors, stayed in the full-time care and custody of plaintiffs.

72.     Upon information and belief, when the bomb-sniffing dogs are retired, they live for an average of five to six additional years. The cost of caring for said animals increases incrementally as they age, primarily due to medical expenses. Upon information and belief, each plaintiff expends, expended, or shall expend an average of $20,000.00 on caring and providing for their animals once they are retired, for which they remain uncompensated for and unpaid, even though the animals remain the personal property of MSA.

73.     Thus, defendants, by their numerous officers and directors, with intent and actual malice, by design, in premeditated fashion, and in conspiracy with each other, exploited the bond between plaintiffs and their assigned dogs, creating a financial windfall for defendants. MSA avoided the obligation to financially support animals no longer useful to them, and shifted this expense to the plaintiffs, who cared for dogs they did not own because of the love they had for their animals and the unique psychological and emotional ties they had with them.

74.     Plaintiffs were and are discouraged from taking time off for sick leave, vacation or other purposes, by both direct and indirect threat of retaliation, and that plaintiffs are actually retaliated against for taking prescribed sick leave permitted by company policy.

75.    Defendants represented to plaintiffs in writing that all veterinary costs of the bomb-sniffing dogs would be covered by MSA. In fact, during the Class Period, MSA covered the veterinary costs of the dogs only until they retired, at which time the plaintiffs herein paid for the full veterinary costs of their assigned dogs for the remainder of their lives

76.    During the course of their employment, plaintiffs incurred significant expense attention to housing and maintaining the dogs. For a portion of the Class Period, plaintiffs were required to log and document these expenses, which routinely exceeded $400 a month. Despite the level of expense, and the documentation that plaintiffs submitted to MSA, plaintiffs were only reimbursed $400 and had to bear all of the additional expenses on their own. Upon information and belief, these Defendants represented in writing that the $400 stipend would cover the costs of maintaining the dogs.

## COUNT ONE
### (FLSA OVERTIME COMPENSATION)

77.    Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 76 as if set forth in full herein.

78.    Pursuant to 29 U.S.C § 207, "no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

79.    As described above, plaintiffs and proposed collective members routinely and continuously worked more than forty hours a week while working for defendants.

80.     Upon information and belief, defendants violated the FLSA by failing to pay plaintiffs and other members of the proposed collective overtime wages at a rate of one and one-half times the normal rate of pay for all hours worked over 40 in any given week.

81.     For more than twenty years, the law in this circuit has been clear that with respect to service animals such as these, that "walking, feeding, training, grooming and cleaning up are integral and indispensable parts of the handler's principal activities and are compensable as work." In the case of plaintiffs and the other proposed class and collective action members, they were not only required to walk, feed, groom, train and clean up after the dogs, they were required to perform defendants' legitimated dog training program, which no reasonable employer could have any reasonable doubt constitute compensable work. Upon information and belief, the failure of defendants to pay plaintiffs and other members of the proposed class and collective action wages and overtime due them was willful and deliberate.

82.     Pursuant to 29 U.S.C. § 216(b), defendants are liable to plaintiffs and the other members of the proposed and collective class action all of their unpaid overtime, an additional equal amount as liquidated damages, attorneys' fees and costs.

83.     By the foregoing reasons, defendants are liable to plaintiffs and members of the proposed class and collective action in an amount to be determined at trial, plus liquidated damages in the amount equal to the amount of unpaid wages, interest, attorneys' fees, and costs.

## COUNT TWO
### (NYLL and NYCRR OVERTIME COMPENSATION)

84.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 83 hereof.

85.     12 NYCRR § 142-2.2 requires that employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate.

86. NYLL § 663 provides that any employee paid by his employer less than the wage to which he is entitled under its provisions may recover in a civil action the amount of any such underpayments, together with costs and reasonable attorneys' fees.

87. As described above, plaintiffs and proposed class members routinely and continuously worked more than forty hours a week while working for defendants.

88. Upon information and belief, plaintiffs and other members of the proposed class did not receive overtime compensation for all hours worked in excess of forty hours in any given week.

89. Upon information and belief, plaintiffs and other members of the proposed class did not receive overtime compensation for all hours worked in excess of 10 hours on any given day.

90. Consequently, by failing to pay to plaintiffs and other members of the proposed class overtime compensation, defendants violated 12 NYCRR § 142-2.2 and NYLL § 663.

91. Upon information and belief, defendants' failure to pay overtime compensation to the Plaintiffs and members of the proposed class was willful.

92. By the foregoing reasons, defendants have violated NYLL § 663 and 12 NYCRR § 142-22 and are liable to plaintiffs and members of the proposed class in an amount to be determined at trial, plus interest, attorneys' fees, and costs.

## COUNT THREE
## (NYLL FAILURE TO PAY WAGES AND WAGE SUPPLEMENTS)

93. Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 92 hereof.

94. Pursuant to New York law workers such as plaintiffs and other members of the proposed class are protected from wage underpayments and improper employment practices.

95.     Pursuant to NYLL § 190, the term "employee" means "any person employed for hire by an employer in any employment."

96.     As persons employed for hire by defendants, plaintiffs and other members of the proposed class are "employees," pursuant to NYLL § 190.

97.     Pursuant to NYLL § 190, the term "employer" includes "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service."

98.     As they hired the plaintiffs and other members of the proposed class, defendants are "employers."

99.     Pursuant to NYLL § 191, plaintiffs and other members of the proposed class are entitled to be paid "not later than seven calendar days after the end of the week in which the wages are earned."

100.    Pursuant to NYLL § 193, "No employer shall make any deduction from the wages of an employees," such as plaintiffs and other members of the proposed class, that is not otherwise authorized by law or by the employee.

101.    By withholding proper wages from plaintiffs and other members of the proposed class, pursuant to NYLL § 193 and the cases interpreting the same, Defendants made unlawful deductions in wages owed to Plaintiffs and other members of the proposed class.

102.    By failing to pay plaintiffs for hours worked on defendants' behalf, including the training of the dogs, travel, and training time, defendants have failed to pay their proper wages.

103.    The unreimbursed expenses incurred by the plaintiffs and the other members of the proposed collective action and class action constitute wage supplements within the meaning of NYLL § 198-c(2) ("the term "benefits or wage supplements" includes, but is not limited to,

reimbursement for expenses") and pursuant to NYLL § 198-c(1) were required to be paid within thirty days after they were incurred.

104.    Upon information and belief, defendants' failure to pay plaintiffs and members of the proposed class wages, wage supplements, and overtime was willful and deliberate.

105.    By the foregoing reasons, defendants have violated NYLL §§ 191, 193 and 198 and pursuant thereto are liable to plaintiffs and other members of the proposed class the full amount by which such plaintiffs and class members were underpaid, prejudgment interest at the rate of nine percent, and all reasonable attorneys' fees.

## COUNT FOUR
## (NYLL 195[3] FAILURE TO PROVIDE ACCURATE WAGE STATEMENTS)

106.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through hereof 105.

107.    Pursuant to NYLL § 195(3), defendants were required to provide the plaintiffs and proposed collective and class members a wage statement which, among other things, was required to include "the number of regular hours worked, and the number of overtime hours worked."

108.    Plaintiffs and the proposed collective and class members were not provided an accurate wage statement NYLL § 195(3) because the wage statements that plaintiffs and the proposed class members received did not account for all the hours that they worked and did not account for all their overtime.

109.    Pursuant to NYLL § 198(1-d), the plaintiffs and proposed collective class members are entitled to collect civil damages of $250 for each work day that such violation occurred not to exceed $5,000 per plaintiff and proposed collective and class member together with costs and reasonable attorneys' fees.

## COUNT FIVE
## [NYLL 198(1-A) LIQUIDATED DAMAGE]

110.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through hereof 109.

111.    Pursuant to NYLL § 198(1-a), unless defendants prove a good faith basis to believe that the underpayment was in compliance with law (which they cannot), plaintiffs and the class members are further entitled to additional amount as liquidated damages equal to one hundred percent of the total amount of the wages found to be due.

112.    Defendants failure to pay wages and overtime for home training of dog is not only in bad faith, but defendants have been marketing the "daily training" provided by plaintiff collective and class members, but not compensating the members for the training that is central to defendants' marketing and business.

WHEREFORE, plaintiffs, individually and on behalf of all other persons similarly situated who were employed by defendants, demand judgment:

(1)     Awarding them their unpaid wages, overtime, liquidated damages as set forth in federal and state law, pre and post judgment interest, damages as set forth in NYLL § 198-a(1-a) and (1-d)

(2)     The right to collect attorneys fee in collecting such judgment, as provided in NYLL § 198(4) and a provision pursuant to NYLL § 198(4) that any amounts remain unpaid upon the expiration of ninety days following issuance of judgment, or ninety days after expiration of the time to appeal and no appeal is then pending, whichever is later, the total amount of judgment shall automatically increase by fifteen percent.

(3)     For an award of injunctive relief against the defendants as this Court deems appropriate to prevent future violations of New York Labor Law.

(4)     Together with such other and further relief as to the Court seems just and proper, including costs, disbursements, and attorneys' fees incurred by plaintiffs herein.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs demand trial by jury in this action of all issues so triable.

Dated: New York, New York
      July 18, 2017

                                  KUDMAN TRACHTEN ALOE LLP

                                  By_____

                                    Paul H. Aloe (PA-6088)
                                    Francis M. Curran (FC-1158)
                                Attorneys for Plaintiffs
                                350 Fifth Avenue, 68th Floor
*Of Counsel:*                      New York, New York 10118
                                (212) 868-1010

David I. Aboulafia (DA-7886)
228 East 45th Street
Suite 1700
New York, New York 10017
(212) 684-1422

- 23 -