UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

In re MICHAEL STAPLETON ASSOCIATES, LTD employment litigation

THIS DOCUMENT RELATES TO:

JOHN BARRETT, BILL BEAURY, JOSEPH BELCASTRO, PETER BROWN, MICHAEL GEIDEL, JOHN HANSEN, JOSEPH C. McWILLIAMS, JOSEPH NACARLO, RICHARD NARCISO, PATRICK O'CONNOR, JOSEPH TALLINI, THOMAS BROWN, PHILLIP BLACKMON, JUAN GOMEZ, ZAHIR MOHAMMED, and DAVID CERRUTI, on behalf of themselves and others similarly situated,

Plaintiffs,

- *against* -

MICHAEL STAPLETON ASSOCIATES, LTD., doing business as MSA SECURITY, MICHAEL O'NEIL, GLEN KUCERA, GEORGE HARVEY, JESSICA A. JOHNSON-COPE, DAVID FERGUSON, JOHN McKEE, GILBERT "CHIP" BAIRD, PERELLA WEINBERG PARTNERS CAPITAL MANAGEMENT LP, doing business as PWP GROWTH EQUITY, and PERELLA WEINBERG PARTNERS LP,

Defendants.

Master File No. 1:17-cv-05468-AJN

---

## FIRST AMENDED CONSOLIDATED COMPLAINT

Plaintiffs, as and for their amended consolidated complaint against defendants, allege as follows:

### Introduction

1. This is the amended complaint in three consolidated actions: *Blackmon, et al. v. Michael Stapleton Associates Ltd. d/b/a MSA Security, et al.*, Case No. 1:18-cv-00936 (AJN),

*Barrett, et al. v. Michael Stapleton Associates Ltd. d/b/a MSA Security, et al.*, Case No. 1:17-cv-05468 (AJN), and *Brown, et al. v. Michael Stapleton Associates Ltd. d/b/a MSA Security, et al.*, Case No. 1:17-cv-07158 (AJN).

2.      This is an action to recover damages and for injunctive relief. This action is brought pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*, New York Labor Law ("NYLL") Article 6, 12 New York Codes, Rules and Regulations ("NYCRR") subpart 142-2.2, and the California Labor Code §§ 510, 1194, 1197, 1197.1, 1189, 2802, 226, and 2698, as well as state and federal prevailing wage provisions in government contracts as to unpaid overtime and other wages and fringe benefits owed to plaintiffs and all similarly situated persons who are presently or were formerly employed by defendant Michael Stapleton Associates, Ltd. doing business as MSA Security ("MSA"), defendant Michael O'Neil[1] ("O'Neil"), defendant Glen Kucera ("Kucera"), defendant George Harvey ("Harvey"), defendant Jessica A. Johnson-Cope ("Johnson"), defendant David Ferguson ("Ferguson"), defendant John McKee ("McKee"), defendant Gilbert "Chip" Baird III ("Baird"), defendant Perella Weinberg Partners Capital Management LP, doing business as PWP Growth Equity ("PWP"), Perella Weinberg Partners LP ("Perella Weinberg") (collectively "defendants"), and/or any other entities affiliated with or controlled by defendants.

## The Parties, Jurisdiction and Venue

3.      Defendant MSA is a foreign corporation registered in the State of New York. Its principal place of business is 9 Murray Street, New York, NY 10007.

4.      Defendant O'Neil is the Chief Executive Officer of MSA and exercises substantial control over the operations of MSA, authorizes and implements the procedures and policies of

---

[1] Defendant O'Neil's last name was inadvertently misspelled in the Complaint dated July 18, 2017.

MSA and, through the officers, directors and supervisors under his direct control and supervision, has final authority and control over all of the employees of MSA. O'Neil's business address is 9 Murray Street, New York, NY 10007 and he is a citizen and resident of the State of New York.

5.     Defendant Kucera is the President of MSA and exercises substantial control over the operations of MSA, authorizes and implements the procedures and policies of MSA and, through the officers and supervisors under his direct control and supervision, has direct authority and control over all of the employees of MSA. Kucera's business address is 9 Murray Street, New York, NY 10007 and he is a citizen and resident of the State of New Jersey.

6.     Defendant Harvey was Operational Chairman of MSA until sometime in 2015. He exercised substantial control over the operations of MSA, authorized and implemented the procedures and policies of MSA and, through the officers, directors and supervisors under his direct control and supervision, had final authority and control over all of the employees of MSA. Harvey is currently a resident of the State of Florida.

7.     Defendant Johnson is a member of the Board of Directors of MSA. She exercises substantial control over the operations of MSA, authorizes and implements the procedures and policies of MSA and, through the officers, directors and supervisors under her direct control and supervision, has authority and control over the terms and conditions of employment of the bomb-sniffing dog handlers of MSA. Her business address is 609 Walton Avenue, Bronx, NY 10451. Upon information and belief, Johnson is a citizen and resident of the State of New York.

8.     Defendant Ferguson is a member of the Board of Directors of MSA. He exercises substantial control over the operations of MSA, authorizes and implements the procedures and policies of MSA and, through the officers, directors and supervisors under his control and supervision, has authority and control over the terms and conditions of employment of the bomb-

sniffing dog handlers of MSA. His business address is PWP Growth Equity, 767 Fifth Avenue, 10th Floor, New York, NY 10153. Upon information and belief, Ferguson is a citizen and resident of the State of New York.

9.      Defendant McKee is a member of the Board of Directors of MSA. He exercises substantial control over the operations of MSA, authorizes and implements the procedures and policies of MSA and, through the officers, directors and supervisors under his control and supervision, has authority and control over the terms and conditions of employment of the bomb-sniffing dog handlers of MSA. His business address is PWP Growth Equity, 767 Fifth Avenue, 10th Floor, New York, NY 10153. Upon information and belief, McKee is a citizen and resident of the State of New York.

10.     PWP is one of the largest shareholders and has a controlling interest in MSA. PWP exercises substantial control over the operations of MSA, authorizes and implements the procedures and policies of MSA and, through the officers, directors and supervisors under its direct control and supervision, has final authority and control over all of the employees of MSA. PWP is a foreign limited partnership registered in the State of New York. Its principal place of business is 767 5th Avenue, New York, NY 10153-0023.

11.     Perella Weinberg is one of the largest shareholders and has a controlling interest in MSA. Perella Weinberg exercises substantial control over the operations of MSA, authorizes and implements the procedures and policies of MSA and, through the officers, directors and supervisors under its direct control and supervision, has final authority and control over all of the employees of MSA. Perella Weinberg is a foreign limited partnership registered in the State of New York. Its principal place of business is 767 5th Avenue, New York, NY 10153-0023.

12.     MSA is a broad-based security firm with over 850 employees. MSA specializes in canine services, i.e., bomb-sniffing dogs, and claims to be one of the largest of its kind in the nation.

13.     Upon information and belief, MSA has annual revenues substantially in excess of Eleven Million Dollars ($11,000,000.00) from government contracts alone. MSA is an enterprise actively engaged in interstate and international commerce.

14.     MSA is an "employer" under the FLSA and under the labor laws of all states in which it provides services to its clients, including but not limited to the States of California and New York.

15.     O'Neil is an "employer" under the FLSA and under the labor laws of all states in which MSA provides services to its clients, including but not limited to the States of California and New York.

16.     Kucera is an "employer" under the FLSA and under the labor laws of all states in which MSA provides services to its clients, including but not limited to the States of California and New York.

17.     Harvey was an "employer" under the FLSA and under the labor laws of all states in which MSA provided services to its clients, including but not limited to the States of California and New York.

18.     Johnson is an "employer" under the FLSA and under the labor laws of all states in which MSA provides services to its clients, including but not limited to the States of California and New York.

19.    Ferguson is an "employer" under the FLSA and under the labor laws of all states in which MSA provides services to its clients, including but not limited to the States of California and New York.

20.    McKee is an "employer" under the FLSA and under the labor laws of all states in which MSA provides services to its clients, including but not limited to the States of California and New York.

21.    PWP is an "employer" under the FLSA and under the labor laws of all states in which MSA provides services to its clients, including but not limited to the States of California and New York.

22.    Perella Weinberg is an "employer" under the FLSA and under the labor laws of all states in which MSA provides services to its clients, including but not limited to the States of California and New York.

23.    Plaintiffs and current or potential members of the collective and class were or are "employees" under the FLSA and under the labor laws of all states in which MSA provides or provided services to its clients, including but not limited to the States of California and New York.

24.    Plaintiffs and current or potential class and collective members are current and former employees of MSA, all of whom are or were employed as handlers of bomb-sniffing dogs. Plaintiffs and current or potential class or collective members include but are not limited to retirees of the New York City Police Department, the NYC Corrections Department, former NYS Court Officers, and former United States military personnel, many of whom saw active duty in combat zones.

25.    According to MSA, "MSA's full-time team of EDC handlers carries both military and law enforcement backgrounds. Before they begin working with MSA dogs, they undergo

extensive training in Explosive Detection, Counter Surveillance and Behavior Pattern Recognition. They receive continuing education and training to successfully address the ever-evolving threat of IEDs [improvised explosive devices]."

26.    Plaintiff JOHN BARRETT ("Barrett") is a citizen and resident of the State of New Jersey. Barrett is a current employee of MSA, serving as a bomb-sniffing dog handler from 2011 to present day. Prior to being employed by MSA, Barrett was a 20-year veteran of the New York City Police Department and retired as a Sergeant on the Homicide Squad. Mr. Barrett was a *9-11* Responder.

27.    Plaintiff BILL BEAURY ("Beaury") is a citizen and resident of the State of New York. Beaury is a former employee of MSA, having served as a bomb-sniffing dog handler between January 2002 to March 2016. Prior to being employed by MSA, Beaury was a 21-year veteran of the New York City Police Department. During his time as a police officer, Beaury was as a union delegate and a *9-11* Responder.

28.    Plaintiff JOSEPH BELCASTRO ("Belcastro") is a citizen and resident of the State of New York. Belcastro is a current employee of MSA, serving as a bomb-sniffing dog handler from 2008 to present day. Prior to being employed by MSA, Belcastro was a 20-year veteran of the New York City Police Department and retired as a Detective. Belcastro was a *9-11* Responder.

29.    Plaintiff PETER BROWN ("Brown") is a citizen and resident of the State of New York. Brown is a former employee of MSA, having served as a bomb-sniffing dog handler between October 2005 to January 2017. Prior to being employed by MSA, Brown was a 20-year veteran of the New York City Police Department, retired as a Sergeant, and was a *9-11* Responder.

30.    Plaintiff MICHAEL GEIDEL ("Geidel") is a citizen and resident of the State of New York. Geidel is a current employee of MSA, serving as a bomb-sniffing dog handler from

2013 to present day. Prior to being employed by MSA, Geidel was an E-5 Sergeant for the United States Air Force.

31.     Plaintiff JOHN HANSEN ("Hansen") is a citizen of and resident of the State of New York. Mr. Hansen is a current employee of MSA, has been an employee of MSA since 2006, and has served as a bomb-sniffing dog handler from 2014 to present day. Between February 2016 and September 2016, Hansen was employed by MSA as a supervisor of the company's bomb-sniffing dog handlers. Prior to being employed by MSA, Hansen was a 20-year veteran of the New York City Police Department and retired as a Detective. Hansen was a *9-11* Responder.

32.     Plaintiff JOSEPH C. McWILLIAMS ("McWilliams") is a citizen of the State of New York. McWilliams is a former employee of MSA, serving as a bomb-sniffing dog handler from 2016 to August 2017. Prior to being employed by MSA, McWilliams served in MARSOC, the special operations force of the United States Marine Corps. During his seven years of service, McWilliams was repeatedly deployed to combat zones throughout the world, including Iraq, where he fought in the Battle of Marjah. During his service with MARSOC, he was awarded two Purple Hearts for the wounds he suffered and was also awarded a Bronze Star with a combat V for acts of valor in combat.

33.     Plaintiff JOSEPH NACARLO ("Narcolo") is a citizen and resident of the State of New York. Narcolo is a current employee of MSA. Narcolo served as a bomb-sniffing dog handler for MSA from 2001 to 2014 and from March 2016 to present, and as a Field Supervisor from September 2014 through March 2016. Prior to being employed by MSA, Narcolo was a 22-year veteran of the New York City Police Department and retired as a Sergeant. Narcolo was a *9-11* Responder.

34.     Plaintiff RICHARD NARCISO ("Narciso") is a citizen and resident of the State of New York. Narciso is a former employee of MSA, having served as a bomb-sniffing dog handler from 2004 to 2016. Prior to being employed by MSA, Narciso was a 20-year veteran of the New York City Police Department and retired as a Detective. Narciso was a *9-11* Responder.

35.     Plaintiff PATRICK O'CONNOR ("O'Connor") is a citizen and resident of the State of New York. O'Connor is a former employee of MSA, having served as a bomb-sniffing dog handler from 2003 to 2015. Prior to being employed by MSA, O'Connor was a 20-year veteran of the New York City Police Department and retired as a Detective on the Bomb Squad. O'Connor was a *9-11* Responder.

36.     Plaintiff JOSEPH TALLINI ("Tallini") is a citizen and resident of the State of New York. Tallini is a current employee of MSA, serving as a bomb-sniffing dog handler from 2012 to present day. Prior to being employed by MSA, Tallini was a 20-year veteran of the New York City Police Department.

37.     Plaintiff THOMAS BROWN ("Brown") is a citizen and resident of the State of New Jersey. Brown is a current employee of MSA, serving as a bomb-sniffing dog handler from 2014 to present day. Prior to being employed by MSA, Brown served in the United States Marine Corps.

38.     Plaintiff PHILLIP BLACKMON ("Blackmon") is a citizen and resident of the State of Texas. Blackmon is a former employee of MSA, serving as a bomb-sniffing dog handler from 2016 to 2017. Prior to being employed by MSA, Blackmon was an 8-year veteran of the United States Navy where he was an explosive ordinance disposal technician. He also worked for five years as a military contractor training the United States Air Force's Security Forces, including the canine division.

39.     Plaintiff JUAN GOMEZ ("Gomez") is a citizen and resident of the State of New York. Gomez is a former employee of MSA, serving as a bomb-sniffing dog handler from 2016 until he was constructively discharged in August 2017. Prior to being employed by MSA, Gomez served four years in the United States Marine Corps and was deployed to combat zones.

40.     Plaintiff ZAHIR MOHAMMED ("Mohammed") is a citizen and resident of the State of California. Mohammed is a former employee of MSA, serving as a bomb-sniffing dog handler from 2015 to 2016. Prior to being employed by MSA, Mohammed was an 8-year veteran of the United States Air Force, where he was a Security Forces Member and a Military Working Dog Handler.

41.     Plaintiff DAVID CERRUTI ("Cerruti") is a citizen and resident of the State of California. Cerruti is a former employee of MSA, serving as a bomb-sniffing dog handler from 2015 to 2016. Prior to being employed by MSA, Cerruti was a 7-year veteran of the Hayward Police Department and a 7-year veteran of the Livermore Police Department.

42.     Subject matter jurisdiction exists with respect to this action pursuant to 29 U.S.C. § 216(b) and 28 U.S.C.§ 1331. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over the claims brought under the provisions of applicable state labor laws.

43.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) in that a substantial part of the events giving rise to the claims herein occurred within this district, and pursuant to 18 U.S.C. § 1965 in that defendants' principal places of business are within this district and defendants transact their affairs within this district.

44.     Personal jurisdiction exists pursuant to CPLR §§ 301 and 302 because defendants' principal places of business are within New York, and the claims hereunder arise out of defendants' transaction of business in New York.

45.     Plaintiffs are properly joined because they assert rights to relief with respect to or arising out of the same series of transactions or occurrences and there are questions of law or fact common to all plaintiffs.

**Collective Action Allegations**

46.     This action is properly maintainable as a collective action pursuant to 29 U.S.C. § 216(b).

47.     This action is brought on behalf of plaintiffs and a collective consisting of similarly situated employees who worked and/or work for defendants as bomb-sniffing dog handlers (collectively "Handlers").

48.     Plaintiffs and other Handlers who have elected or elect in the future to opt-in as part of the collective action are all victims of the defendants' common policy and/or plan to violate the FLSA by (1) failing to pay all earned wages; and (2) failing to provide overtime wages, at the rate of one and one-half times the regular rate of pay, for all time worked in excess of 40 hours in any given week pursuant to 29 U.S.C. § 207.

49.     The names of all potential members of the collective may be readily identified in defendants' payroll records but are not known or knowable without defendants' records or discovery.

50.     The questions of law and fact common to the collective predominate over any questions affecting only individual members. These questions of law and fact include, but are not limited to: (1) whether defendants have maintained a common policy of requiring all Handlers to train, care for and maintain defendants' canines on a daily basis; (2) whether defendants have maintained a common policy of failing to compensate Handlers for all daily and weekly hours of work spent training and caring for defendants' canines; (3) whether the hours Handlers worked and/or without pay were and/or are lawfully compensable pursuant to the FLSA (4) whether

defendants have failed to pay Handlers all earned wages; (5) and whether the defendants have required Handlers to perform work on their behalf and for their benefit for which they were not compensated; and (6) whether the defendants have failed to pay Handlers overtime wages, at the rate of one and one half times the regular rate of pay, for all hours worked in excess of 40 hours in any given week in violation of the FLSA.

51.     The claims of plaintiffs are typical of the claims of the collective. Plaintiffs and current or potential collective members were and/or are all subject to defendants' common policies uniformly applied and willful practices of failing to pay employees all earned overtime wages. Plaintiffs and current or potential collective members performed and/or perform similar duties, were and/or are all subject to defendants' unlawful pay practices, were and/or are similarly situated in the terms and conditions of their employment and have thus sustained and/or continue to sustain similar injuries as a result of the defendants' actions.

52.     Upon information and belief, defendants uniformly apply the same employment policies, practices, and procedures to all Handlers who worked and/or work for defendants.

53.     Plaintiffs and their counsel will fairly and adequately protect the interests of the collective. Plaintiffs have retained counsel experienced in complex wage and hour collective and class action litigation.

54.     A collective action is superior to other available methods for the fair and efficient adjudication of this controversy. The individual plaintiffs and current or potential collective members lack the financial resources to adequately prosecute separate lawsuits against defendants.

## Class Action Allegations

55.     This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

56.     This action is brought on behalf of the plaintiffs and a class consisting of similarly situated employees who worked and/or work for defendants as Handlers in the States of New York, and California.

57.     The class (asserting claims under the laws of the States of New York and California) is so numerous that joinder of all members is impracticable. Based upon incomplete data, the size of the New York class is believed to be in excess of 250 Handlers, and the size of the California class is believed to be in excess of 55 Handlers. In addition, the names of all potential members of the class are not known or knowable without defendants' records or discovery.

58.     Defendants acted and refused (and continue to act and refuse) to act on grounds that apply generally and uniformly to each of the class members, such that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

59.     The questions of law and fact common to the class predominate over any questions affecting only individual members. These questions of law and fact include, but are not limited to: (1) whether defendants have maintained a common policy of requiring all Handlers to train, care for and maintain defendants' canines on a daily basis; (2) whether defendants have maintained a common policy of failing to compensate Handlers for all daily and weekly hours of work spent training and caring for defendants' canines; (3) whether the hours Handlers worked and/or work without pay were and/or are lawfully compensable; (4) whether defendants have failed to pay Handlers all earned wages; (5) and whether the defendants have required Handlers to perform work on their behalf and for theirs benefit for which they were not compensated; and (6) whether the defendants have failed to pay Handlers overtime wages, at the rate of one and one half times the regular rate of pay or more, for all hours worked in excess of 40 hours in any given week in

violation of the laws of New York, California, and all states in which MSA provides or provided services to its clients.

60.     The claims of plaintiffs are typical of the claims of the class. Plaintiffs and current or potential class members were and/or are all subject to defendants' common policies and uniform willful practices of failing to pay employees all earned overtime wages. Plaintiffs and current or potential class members performed and/or perform similar duties, were and/or are all subject to defendants' unlawful pay practices, were and/or are similarly situated in the terms and conditions of their employment Plaintiffs and current or potential class members have thus sustained and/or continue to sustain similar injuries as a result of the defendants' actions.

61.     Upon information and belief, defendants uniformly apply the same employment policies, practices, and procedures to all Handlers who worked and/or work for defendants.

62.     Plaintiffs and their counsel will fairly and adequately protect the interests of the class and any subclasses. Plaintiffs have retained counsel experienced in complex wage and hour collective and class action litigation.

63.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The individual plaintiffs and current or potential class members lack the financial resources to adequately prosecute separate lawsuits against defendants. A class action will also prevent unduly duplicative litigation resulting from inconsistent judgments pertaining to the defendants' policies.

**Factual Background**

64.     At all relevant times, Handlers were and/or are hourly employees compensated at rates from $26 to $35 or more an hour during all or part of the time from July 18, 2011 to the present ("the Class Period")

65.     At all relevant times, Handlers were and/or are at-will employees. Upon information and belief, at all relevant times, there were no written contracts between the parties hereto.

66.     At all relevant times, Handlers were and/or are each assigned one of defendants' bomb-sniffing dogs (usually a Labrador Retriever) which lived and/or live in their homes. These dogs lived and work and/or live and work continuously with Handlers but remain the property of defendants. At any time, the dogs may be removed (or have been removed) from the possession of Handlers by defendants for any reason or for no reason at all, at defendants' whim.

67.     MSA boasts that it has "a highly-successful Explosive Detection Canine (EDC) program" that is "rooted in an unmatched training philosophy and truly unique-to-the-industry focus on the development of single-purpose, single-handler teams that are trained exclusively in explosive odor detection." As part of this training, each bomb-sniffing dog requires constant training that entails many hours of work each day. This training requires that these animals only be fed after sniffing out the scent of explosives.

68.     MSA further boasts that "[d]ogs are trained daily utilizing either food or play rewards depending on their individual interest and always using real, uncontaminated explosives."

69.     As MSA describes it, "[u]nlike other providers, MSA bomb dogs are never kenneled or used by multiple handlers once put to work. They live at home with their handler and receive daily training. This improves their temperament and makes them far more effective at work."

70.     MSA also states that "[a]fter a hard day searching for explosives, it wouldn't be right to put an MSA canine in a cage. That's why MSA doesn't kennel our dogs. When their workday is over, they go home with their family." MSA also states: "Another thing we don't do is

break up their routine by assigning them multiple handlers. We stick to our 'One Dog, One Handler' policy. This ensures optimum performance, and keeps our dogs happy, healthy, and effective."

71.     Accordingly, defendants required and/or require Handlers to hand-feed their assigned animals all of their meals throughout their lives. All meals the bomb-sniffing dogs received were and/or are part of a required training regimen. In actual practice, trace amounts of explosives were and/or are hidden in vehicles or in rooms or in a backyard in a prescribed manner, and the dogs were and/or are required to find those explosives. The dogs were and/or are rewarded for finding the explosives with food, which is fed to them - one handful per session - by Handlers. This training required and/or requires Handlers to place trace explosives in several different locations, have the dog search for and find the explosives, and then remove the trace explosives from the testing location.

72.     The defendants required and/or require Handlers, as a matter of policy and required procedure, to train/feed their dogs in this manner, seven days a week, 365 days a year. Each meal provided to the dog is a training session required to last from between one-half hour to one and a half hours (one to three hours each day of total feeding/training). Most of these meal/training sessions must be provided during times when Handlers were and/or are not on the clock, and therefore was and/or is mandated uncompensated work time, in violation of the FLSA and the laws of New York and California and all other states in which defendants provided and/or provide services to their clients.

73.     Defendants required and/or require not only that Handlers perform the bomb-sniffing dog training described above, but also that Handlers document and report the hours spent doing so. Accordingly, the work described herein was and/or is performed with the knowledge of,

and indeed at the direction of, the defendants. Handlers typically worked and/or work schedules of eight, ten, or twelve-hour days, three to four days a week, excluding any additional overtime. Handlers may train/feed the dogs at various times throughout the day, both when they are on-duty and when they are off-duty. These meals/training must be provided both on days on which Handlers were and/or are not scheduled to work (and hence not paid) and for times before and after their paid shift.

74.     This daily training that Handlers were required to provide and/or must provide each day was and/or is performed without compensation to Handlers yet is integral to defendants' business. Indeed, MSA brags on its website that "[w]ith an uncompromised commitment to comprehensive best-in-class training of our canines and handlers, MSA delivers an unrivaled and nationally-certified Explosive Detection Canine (EDC) team that keeps millions of people safe across the globe."

75.     When Handlers had and/or have time off on their regular schedules (typically, 3-4 days a week), they were and/or are still required to train/feed their animals in the manner established by defendants' corporate procedure and policy. In other words, they were and/or are required to train/feed their assigned bomb-sniffing dogs between one and three hours a day when they had time off. At all relevant times, Handlers were and/or are not compensated for this work. Indeed, to this day, they still are not compensated for this work.

76.     This required regimen did not change if any of the Handlers worked and/or work part-time, such as one or two days a week. In such event, the amount of unpaid work conducted by Handlers increased and/or increases incrementally. Handlers were and/or are still required to train/feed their dogs between one and three hours a day during the time Handlers were and/or are

off-duty and unpaid, and regardless of whether such work might mandate payment of overtime under federal or state law.

77.     Pursuant to defendants' policies and procedures, Handlers were and/or are also responsible for performing other tasks necessary to maintain the dogs' health and appearance for the benefit of defendants. These tasks include grooming, nail-clipping, and bathing the dogs, as well as engaging in socialization activities with the dogs. These tasks were and/or are performed while Handlers were and/or are off-duty and were and/or are therefore unpaid.

78.     Defendants were and/or are required to pay Handlers for the time they spent and/or spend feeding, grooming, caring for, and training the dogs that they were and/or are assigned, but failed to do so and continue to fail to do so.  Defendants were and/or are also required to pay for tasks associated with the care of the dogs, such as taking the dogs to the veterinarian, but failed to do so and continue to fail to do so.

79.     Defendants were and/or are required to pay Handlers for the travel time required for them to drive to and from one work assignment to another, including but not limited to time during the travel time associated with grooming, caring for and training of the dogs, and transporting the dogs as required by defendants' business.

80.     Handlers were and/or are indiscriminately paid at disparate rates for lunch hours and breaks. For some assignments, Handlers were and/or are not paid for lunch hours and breaks, regardless of the length of the tour of duty.

81.     Approximately three times a year, Handlers were and/or are required to attend training and certification classes with their dogs, which each lasted and/or lasts approximately four hours. Such classes have typically been conducted in Windsor, Connecticut. Handlers travelled and/or travel with their assigned bomb-sniffing dogs as much as five hours per day to and from

said classes and were and/or are not paid for this travel time. To the extent this time worked constituted and/or constitutes overtime under state or federal law, Handlers were and/or are not paid for overtime.

82.     At various times during the Class Periods, when Handlers attended and/or attend these training classes, Handlers were and/or are paid a reduced "training rate" regardless of whether such reduced payments might otherwise mandate payment of overtime under federal or state law.

83.     At all relevant times, prior to any bomb-sniffing dog being "retired" at the age of about nine years, the veterinary care of such dogs was and/or is provided by veterinarians retained by defendants at various locations or local veterinarians. Handlers were and/or are not paid for the travel time associated with bringing their assigned bomb-sniffing dogs to these veterinarians. To the extent this additional time work constituted or constitutes overtime under state or federal law, Handlers were and/or are not paid for overtime.

84.     Handlers have repeatedly protested to MSA management with respect to the unpaid work time alleged herein. The defendants have continuously ignored the protests of their Handlers.

85.     As described, the bomb-sniffing dogs were and/or are exclusively trained by Handlers, who were and/or are with their animals continuously, living with them and working with them. By virtue of this continuous physical proximity, and the unique activities shared between Handlers and their assigned dogs, an unparalleled psychological and emotional bond was and/or continues to be created between Handlers and their assigned dogs.

86.     At all relevant times, defendants claimed and asserted ownership, dominance and control over the animals cared for and maintained by Handlers. Defendants could and did remove dogs from the physical possession of Handlers for any reason or no reason.

87.     MSA, by its numerous officers and directors, intentionally, by design, in premeditated fashion, and in an active, on-going conspiracy with each other, alternatively employed its ability to take the dogs from Handlers as both a means of retaliation, and as direct and indirect threats for purposes of squelching dissent, maintaining "order in the ranks," and discouraging objection to and reporting of the on-going, unlawful activities described herein.

88.     At various times, with actual malice, defendants intentionally exploited the bond between Handlers and their assigned dogs by retaliating against Handlers who they disfavored by taking their animals away from them. Where such Handlers were terminated, they were given no option to purchase or otherwise keep their previously assigned dogs.

89.     Handlers have had their regular posts or hours of duty changed if they protested the unlawful activities of the defendants described herein, if they refused to accept unreasonable overtime assignments, if they were considered "problems," if they committed acts deemed "offensive" by MSA management.

90.     Throughout the Class Periods, when the bomb-sniffing dogs reached the age of nine or ten, they were "retired" because defendants deemed them too old to perform their required functions. At such time the animals stayed, by design of the defendants, in the full-time care and custody of their Handlers. Those Handlers continued to feed, board, attend to, and provide for the medical care of their animals at their expense for the remainder of the animals' lives. Those Handlers were then assigned younger dogs which, like their predecessors, stayed in the full-time care and custody of the Handlers.

91.     Upon information and belief, when the bomb-sniffing dogs are retired, they live for an average of five to six additional years. The cost of caring for said animals increases incrementally as they age, primarily due to medical expenses. Upon information and belief, each

Handler expends, expended, or shall expend an average of $20,000.00 on caring and providing for their animals once they are retired, for which they remain unpaid, even though the animals remain the personal property of defendants.

92.     Thus, defendants, by their numerous officers and directors, with intent and actual malice, by design, in premeditated fashion, and in conspiracy with each other, exploited the bond between Handlers and their assigned dogs, creating a financial windfall for defendants. Defendants avoided the obligation to financially support animals no longer useful to them, and shifted this expense to their Handlers, who cared for dogs they did not own because of the love they had for their animals and the unique psychological and emotional ties they had with them.

93.     Handlers were and/or are discouraged from taking time off for sick leave, vacation or other purposes, by both direct and indirect threat of retaliation, and Handlers were and/or are actually retaliated against for taking prescribed sick leave permitted by company policy.

94.     Defendants represented to Handlers in writing that all veterinary costs of the bomb-sniffing dogs would be covered by MSA. In fact, during the Class Periods, MSA covered the veterinary costs of the dogs only until they retired, at which time the plaintiffs herein paid for the full veterinary costs of their assigned dogs for the remainder of their lives.

95.     During the course of their employment, Handlers incurred and/or incur significant expense attendant to housing and maintaining their assigned dogs. For a portion of the Class Periods, Handlers were required to log and document these expenses, which routinely exceeded $400 a month. Despite the level of expense, and the documentation that Handlers submitted to defendants, Handlers were only reimbursed $400 and had to bear all of the additional expenses on their own. Upon information and belief, these defendants represented in writing that the $400 stipend would cover the costs of maintaining the dogs.

96.     Many Handlers performed and/or perform work on public sites pursuant to federal, state and local government contracts that contained and/or contain Wage Determinations requiring defendants to pay prevailing wage rates and fringe benefits. Defendants failed and/or fail to pay those Handlers the wage rates and fringe benefits required by the Wage Determinations of defendants' public service contracts.

## COUNT ONE
## (FLSA OVERTIME COMPENSATION)

97.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 95 as if set forth in full herein.

98.     Pursuant to 29 U.S.C § 207, "no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

99.     As described above, Handlers routinely and continuously worked and/or work more than forty hours a week while working for defendants.

100.    Defendants violated the FLSA by failing to pay Handlers overtime wages at a rate of one and one-half times their regular rate of pay for all hours worked over 40 in any given week.

101.    For more than twenty years, the law in this circuit has been clear that with respect to service animals such as these, that "walking, feeding, training, grooming and cleaning up are integral and indispensable parts of the handler's principal activities and are compensable as work." In the case of Handlers, they were and/or are not only required to walk, feed, groom, train and clean up after their assigned dogs, they were and/or are required to perform defendants' mandated

dog training program, which no reasonable employer could have any reasonable doubt constitutes compensable work. Upon information and belief, the failure of defendants to pay Handlers wages and overtime due to them was and/or is willful and deliberate.

102.     Pursuant to 29 U.S.C. § 216(b), defendants are liable to Handlers for all of their unpaid overtime, an additional equal amount as liquidated damages, attorneys' fees and costs.

103.     By the foregoing reasons, defendants are liable to Handlers in an amount to be determined at trial, plus liquidated damages in the amount equal to the amount of unpaid wages, interest, attorneys' fees, and costs.

## COUNT TWO
### (NYLL and NYCRR OVERTIME COMPENSATION)

104.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 103 as if set forth in full herein.

105.     12 NYCRR § 142-2.2 requires that employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate.

106.     NYLL § 663 provides that any employee paid by his employer less than the wage to which he is entitled under its provisions may recover in a civil action the amount of any such underpayments, together with costs and reasonable attorneys' fees.

107.     As described above, Handlers routinely and continuously worked and/or work more than forty hours a week while working for defendants.

108.     Upon information and belief, Handlers did and/or do not receive overtime compensation for all hours worked in excess of forty hours in any given week.

109.     Upon information and belief, Handlers did and/or do not receive overtime compensation for all hours worked in excess of 10 hours on any given day.

110.     Consequently, by failing to pay to Handlers overtime compensation, defendants violated and continue to violate 12 NYCRR § 142-2.2 and NYLL § 663.

111.     Upon information and belief, defendants' failure to pay overtime compensation to Handlers was and is willful.

112.     By the foregoing reasons, defendants have violated and continue to violate NYLL § 663 and 12 NYCRR § 142-22 and are liable to Handlers in an amount to be determined at trial, plus interest, liquidated damages, attorneys' fees, and costs.

## COUNT THREE
## (NYLL FAILURE TO PAY WAGES AND WAGE SUPPLEMENTS)

113.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 112 as if set forth in full herein.

114.     Pursuant to New York law workers such as Handlers were and/or are protected from wage underpayments and improper employment practices.

115.     Pursuant to NYLL § 190, the term "employee" means "any person employed for hire by an employer in any employment."

116.     As persons employed for hire by defendants, Handlers were and/or are "employees," pursuant to NYLL § 190.

117.     Pursuant to NYLL § 190, the term "employer" includes "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service."

118.     As they hired Handlers, defendants were and/or are "employers."

119.     Pursuant to NYLL § 191, Handlers were and/or are entitled to be paid "not later than seven calendar days after the end of the week in which the wages are earned."

120.    Pursuant to NYLL § 193, "[n]o employer shall make any deduction from the wages of an employee," such as Handlers, that is not otherwise authorized by law or by the employee.

121.    By withholding proper wages from Handlers, pursuant to NYLL § 193 and the cases interpreting the same, defendants made and/or continue to make unlawful deductions in wages owed to Handlers.

122.    By failing to pay Handlers for hours worked on defendants' behalf, including the training of the dogs, travel, and training time, defendants have failed to pay and/or continue to fail to pay their proper wages.

123.    The unreimbursed expenses incurred by Handlers constitute wage supplements within the meaning of NYLL § 198-c(2) ("the term "benefits or wage supplements" includes, but is not limited to, reimbursement for expenses") and pursuant to NYLL § 198-c(1) were and/or are required to be paid within thirty days after they were and/or are incurred.

124.    Upon information and belief, defendants' failure to pay Handlers wages, wage supplements, and overtime was and is willful and deliberate.

125.    By the foregoing reasons, defendants have violated NYLL §§ 191, 193 and 198 and pursuant thereto are liable to Handlers for the full amount by which Handlers were and/or are underpaid, prejudgment interest at the rate of nine percent, and all reasonable attorneys' fees.

## COUNT FOUR
## (NYLL 195[3] FAILURE TO PROVIDE ACCURATE WAGE STATEMENTS)

126.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 125 as if set forth fully herein.

127.    Pursuant to NYLL § 195(3), defendants were and/or are required to provide Handlers a wage statement which, among other things, was required to include "the number of regular hours worked, and the number of overtime hours worked."

128.     Handlers were and/or are not provided an accurate wage statement under NYLL § 195(3) because the wage statements Handlers received and/or receive do not account for all the hours that they worked and/or work and do not account for all their overtime.

129.     Pursuant to NYLL § 198(1-d), Handlers are entitled to collect civil damages of $250 for each work day that such violation occurred and/or occurs not to exceed $5,000 per Handler together with costs and reasonable attorneys' fees.

## COUNT FIVE
## [NYLL 198(1-A) LIQUIDATED DAMAGE]

130.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 129 as if set forth in full herein.

131.     Pursuant to NYLL § 198(1-a), unless defendants prove a good faith basis to believe that the underpayment was and/or is in compliance with law (which they cannot), Handlers are further entitled to additional amount as liquidated damages equal to one hundred percent of the total amount of the wages found to be due.

132.     Defendants failure to pay wages and overtime wages for home training of Handlers' assigned dogs was and/or is not only in bad faith, but defendants have been marketing the "daily training" provided by Handlers, but not compensating them for the training that is central to defendants' marketing and business.

## COUNT SIX
## [CALIFORNIA LABOR CODE VIOLATIONS FAILURE TO PAY ALL WAGES DUE]

133.     Plaintiffs repeat and re-allege the allegations of paragraphs 1 through 132 as if set forth in full herein.

134.     At all relevant times, defendants were and are subject to the overtime wages laws of the State of California pursuant to California Labor Code § 510 regarding work undertaken for

and on behalf of defendants. Pursuant to California Labor Code § 510, defendants had and continue to have a duty to pay their employees, including Handlers, no less than one and one-half times their agreed upon regular rates of pay for all hours worked in excess of 8 hours a day or 40 hours a week. Therefore, California law provides for "daily" and "weekly overtime" payments for employees. In the instances where Handlers worked and/or work over 12 hours in a day or over 60 hours in a week, defendants should have paid and/or should pay them two times the hourly rate. Under California Labor Code § 1194, Handlers are entitled to be paid overtime wages and have standing to sue for such violations.

135.    Pursuant to California Labor Code § 1194, Handlers seek earned but unpaid overtime wages at the legal rates for all daily and weekly overtime. Handlers are entitled to and therefore request an award of pre-judgment interest on the unpaid wages set forth herein.

136.    At all relevant times, defendants were and are subject to the minimum wage laws of the State of California pursuant to California Labor Code §§ 1194 and 1194.2. Pursuant to California Labor § 1194, defendants had and continue to have a duty to pay their employees, including Handlers, no less than the minimum wage for all hours worked. Under California Labor Code § 1194, Handlers are entitled to be paid minimum wages and have standing to sue for such violations.

137.    Pursuant to California Labor Code §§ 1194 and 1194.2, Handlers seek unpaid minimum wages and penalties for defendants' failure to pay minimum wages.

138.    Wherefore, Handlers are entitled to recover the unpaid additional and/or premium wages, including at least minimum wage and all unpaid daily and weekly overtime wages, interest thereon, reasonable attorney's fees and costs of suit pursuant to California Labor Code § 1194(a).

139.     As a direct and proximate result of defendants' conduct, Handlers are also entitled to attorney's fees under California Labor Code §§ 218.5 and 1194, in addition to interest, expenses, and costs of suit.

## COUNT SEVEN
## [CALIFORNIA LABOR CODE VIOLATION FAILURE TO PROVIDE ITEMIZED WAGE STATEMENTS]

140.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 139 as if set forth in full herein.

141.     California Labor Code § 226(a) provides that every employer shall, semimonthly or at the time of each payment of wages, provide each employee with a written, itemized statement showing, inter alia, the gross wages earned, the total hours worked by the employee, and the applicable hourly rate in effect during the pay period and the corresponding number of hours earned at each hourly rate.

142.     The IWC Wage Orders also establish this requirement. See 8 Cal. Code of Regs. § 11040(8).

143.     California Labor Code § 226(e) provides: "[a]n employee suffering injury as a result of a knowing and intentional failure by employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which the violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not exceeding an aggregate penalty of four thousand dollars ($4000), and is entitled to an award of costs and attorney's fees."

144.     Defendants failed to provide accurate, itemized wage statements to Handlers, in that the wage statements that defendants provided and/or provide to their employees, including Handlers, do not accurately reflect the actual hours worked and the wages earned.

145.    Defendants are liable to Handlers for the amounts described above, in addition to the civil penalties provided for in California Labor Code § 226.3.

146.    Handlers have incurred, and will continue to incur, attorneys' fees in the prosecution of this action and therefore demand such reasonable attorneys' fees and costs as set by the Court

### COUNT EIGHT
### [CALIFORNIA PRIVATE ATTORNEY GENERAL ACT PENALTIES]

147.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 146 as if set forth in full herein.

148.    Defendants' failure to pay overtime also gives rise to penalties under the California Private Attorney General Act ("PAGA"). Such penalties may be awarded at $100 for the first pay period and $200 for each subsequent pay period for each violation of the California Labor Code and applicable wage order. PAGA penalties for failure to pay overtime and double time pay are awarded at $50 for the first pay period and $100 for each subsequent pay period.

149.    As pled above, defendants failed and continue to fail to pay Handlers overtime and provide them with accurate wage statements. Plaintiffs intend to notify the Labor Workforce Development Agency and hereby notify defendants that they intend to seek PAGA penalties on behalf of Handlers in addition to themselves. Plaintiffs' representative PAGA claims expose defendants to liability for civil penalties for each similarly situated Class Action Member at the rate of $100 for the first pay period and $200 for each subsequent pay period for each violation of the California Labor Code and applicable wage order

## COUNT NINE
## [FLSA AND FEDERAL PREVAILING WAGE VIOLATIONS]

150.    Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 149 as if set forth in full herein.

151.    41 U.S.C. §§ 6701-6703, provide, in pertinent part that "any contract … made by the Federal Government … [which] involves an amount exceeding $2500, and has as its principal purpose the furnishing of services … shall contain a provision specifying the minimum wage to be paid to each class of service employee … in accordance with prevailing wages in the locality."

152.    Many Handlers were and/or are paid less than the applicable rate set forth in the defendants' contracts with Federal government agencies while providing service at buildings and facilities owned or controlled by the Federal government, pursuant to contracts between defendants and the Federal government and its agencies.

153.    Defendants failed and continue to fail to pay Handlers serving at buildings and facilities owned or controlled by the Federal government the prevailing hourly wage rate or fringe benefits as required by their contracts.

154.    Defendants have violated the FLSA by failing and continuing to fail to pay overtime based upon the prevailing wage rate for Handlers who provided and/or provide service at buildings and facilities owned or controlled by the Federal government pursuant to contracts between defendants and the Federal government and its agencies.

155.    Pursuant to 29 U.S.C. § 216(b), defendants are liable to such Handlers for all of the unpaid overtime wages calculated at time and one-half the appropriate prevailing wage rate as the Handlers' regular rate, and additional equal amount as liquidated damages, as well as attorneys' fees and costs.

## COUNT TEN
## [NYLL PREVAILING WAGE VIOLATIONS]

156.     Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 155 as if set forth in full herein.

157.     NYLL § 231 provides that "[e]very contractor shall pay a service employee under a contract for building service work a wage of not less than the prevailing wage in the locality for the craft, trade, or occupation of the service employee."

158.     Defendants failed and continue to fail to pay Handlers the prevailing hourly wage rate or fringe benefits as required by their contract with state or city governments.

159.     Handlers, as third-party beneficiaries of defendants' contracts with government agencies to pay wages as required by NYLL § 230 et seq. and NYC Admin. Code § 6-130, are entitled to relief for breach of this contractual obligation, plus interest.

160.     Upon information and belief, defendants' failure to pay Handlers the required prevailing hourly wage rate or fringe benefits to which they were entitled to was and still is willful.

161.     Upon information and belief, at all relevant times the defendants were and are required to certify (and did certify) that they Handlers the amount of wages required by NYLL § 230 et seq. and NYC Admin. Code § 6-130.

162.     For the above reasons, defendants have violated and continue to violate NYLL § 230 et seq. and NYC Admin. Code § 6-130 and are liable to Handlers as third-party beneficiaries for damages, attorneys' fees, costs, and interest.

WHEREFORE, plaintiffs, individually and on behalf of all other persons similarly situated who were or are employed by defendants, demand judgment:

(1)     Awarding them their unpaid wages, overtime, liquidated damages as set forth in federal and state law, and they are entitled to recovery of such amounts, pre- and post-judgment

interest, damages as set forth in NYLL § 198-a(1-a) and (1-d), attorneys' fees and costs pursuant to the FLSA, and civil penalties pursuant to California law.

(2)    The right to collect attorneys' fees in collecting such judgment, as provided in NYLL § 198(4) and a provision pursuant to NYLL § 198(4) that if any amounts remain unpaid upon the expiration of ninety days following issuance of judgment, or ninety days after expiration of the time to appeal and no appeal is then pending, whichever is later, the total amount of judgment shall automatically increase by fifteen percent.

(3)    For an award of injunctive relief against the defendants as this Court deems appropriate to prevent future violations of New York Labor Law.

(4)    Together with such other and further relief as to the Court seems just and proper, including costs, disbursements, and attorneys' fees incurred by plaintiffs herein.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs demand trial by jury

in this action of all issues so triable.

Dated:  New York, New York
         April 16, 2018

KUDMAN TRACHTEN ALOE LLP

*Of Counsel:*

By__/s/ Paul H. Aloe_____
   Paul H. Aloe (PA-6088)
   Francis M. Curran (FC-1158)

David I. Aboulafia (DA-7886)
228 East 45th Street
Suite 1700
New York, New York 10017
(212) 684-1422

Lead Counsel and Attorneys for John Barrett,
Bill Beaury, Joseph Belcastro, Peter Brown,
Michael Geidel, John Hannsen, Joseph C.
McWilliams, Joseph Narcolo, Richard
Narciso, Patrick O'Connor, and Joseph Tallini

350 Fifth Avenue, 68th Floor
New York, New York 10118
(212) 868-1010

MAZZEO SONG, P.C.

BAILEY PEAVY BAILEY COWAN
HECKAMAN PLLC

By __/s/ Douglas Weiner_____
   Douglas Weiner (DW 1965)
   Darren Shield (DS 1337)

By___/s/ Robert W. Cowan_____
   Robert W. Cowan
   (admitted *pro hac vice*)
   Justin C. Jenson
   (admitted *pro hac vice*)

Attorneys for Thomas Brown
444 Madison Avenue, Fourth Floor
New York, New York 10022
(212) 599-0700

Attorneys for Phillip Blackmon, David
Cerruti, Juan Gomez, and Zahir Mohammed
5555 San Felipe St., Suite 900
Houston, Texas 77056
(713) 425-7100

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 16, 2018, a copy of foregoing First Amended Consolidated Complaint was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


/s/ Francis M. Curran_____